LONG, Presiding Judge.
In June 1988, the appellant, David Freeman, was indicted for six counts of capital murder in connection with the murders of Mary Gordon and Sylvia Gordon. Count I of the indictment charged Freeman with the murder of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975. Count II charged Freeman with the murder of Sylvia Gordon during a burglary in the first degree, see § 13A-5-40(a)(4), Ala.Code 1975. Count III charged Freeman with the murder of Mary Gordon during a burglary in the first degree, see § 13A-5-40(a)(4), Ala.Code 1975. Count IV charged Freeman with the murder of Sylvia Gordon during a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975. Count V charged Freeman with the murder of Mary Gordon during a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975. Lastly, Count VI of the indictment charged Freeman with the murder of Mary Gordon during a rape in the first degree, see § 13A-5-40(a)(3), Ala. Code 1975. In August 1989, a jury found Freeman guilty of all six counts of capital murder charged in the indictment. The jury recommended, by a vote of 11-1, that Freeman be sentenced to death; the trial court accepted the jury’s recommendation and sentenced Freeman to death by electrocution.
On direct appeal, this court reversed Freeman’s convictions and remanded the cause for a new trial based on the prosecution’s discriminatory us'e of its peremptory challenges in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). See Freeman v. State, 651 So.2d 573 (Ala.Cr.App.1992), rev’d on return to remand, 651 So.2d 576 (Ala.Cr.App.1994). Freeman was retried in 1996, and he was once again found guilty of all six counts of capital murder charged in the indictment. The jury again recommended, by a vote of 11-1, that Freeman be sentenced to death; the trial court accepted *169 the jury’s recommendation and sentenced Freeman to death by electrocution. This appeal follows.
At trial, Freeman did not deny that he murdered Mary Gordon and Sylvia Gordon. Instead, he pleaded not guilty by reason of mental disease or defect, and he argued to the jury that as a result of his alleged mental disease or defect, he was unable to conform his conduct to the requirements of the law. The evidence against Freeman was overwhelming. In its sentencing order, the trial court made the following findings of fact concerning the crime and Freeman’s participation in the murders:
“On March 11, 1988, Deborah Gordon Hosford picked up her sister, [17-year-old] Sylvia Gordon, from Lanier High School [in Montgomery] and drove to their home at 29 Rosebud Court, arriving at approximately 3:30 p.m. Waiting on the porch was the defendant, David Freeman, who had ridden his bicycle to their home. Freeman ... lived in a trailer near the Gordon home, and he wanted a romantic relationship with Sylvia Gordon. Sylvia was not romantically interested in Freeman, and was planning to tell him that she no longer wished to see him. Deborah, Sylvia, and Freeman entered the home. Deborah had to return to work and left at approximately 3:45 p.m. When she left, Freeman and Sylvia were sitting on the couch.
“Freeman had given Sylvia a note essentially stating that he did not like seeing her only once a week, that he loved her, and that he did not want to lose her like all of his other girlfriends. Sylvia in return gave Freeman a note stating that she viewed the relationship only as friendship and that she did not want to have a serious relationship. Approximately a week prior to the murders, Freeman had a conversation with Francis Boozer, a co-worker, and told her that he would rather see Sylvia dead than [for] someone else have her.
“At about 1:00 a.m. Deborah Gordon Hosford returned home. She found the lights of the home turned off and the door unlocked and slightly ajar. She went inside and noticed that the house had been ransacked. She went to her sister’s bedroom and found Sylvia, dead, in her bed with multiple stab wounds and clad only in a T-shirt and socks. As she was fleeing the house, she saw her mother, [43-year-old] Mary Gordon, lying in a pool of blood on the floor of her bedroom. Mrs. Gordon was clad only in a shirt, with her body being nude from the waist down with her legs spread apart.
“Police arrived at the Gordon home and found blood throughout most of the house. Mary Gordon was stabbed 14 times by Freeman; two wounds were fatal. She lived for about five minutes [after being stabbed the first time]. She had also been raped, and the semen deposited in her was consistent as having been left by Freeman. Sylvia Gordon was stabbed 22 times by him, and she remained conscious for eight to ten minutes after the first wound was inflicted. None of the wounds were fatal; Sylvia Gordon bled to death. Examination also revealed that Sylvia Gordon had tears in her vagina. Additionally, police found a shoe print on the shirt of Mary Gordon and a shoe print on a card found on the floor near the body of Mary Gordon. Police also noted that all [telephone] lines in the house had been cut.
“Freeman had brought a knife with him and used it to brutally kill Sylvia Gordon because she did not want a relationship, as well as [to] kill Mary Gordon when she walked in on the murder. After committing the murders, Freeman stole the Gordons’ 1980 Pontiac Sunbird and put his bike that he had ridden to the Gordon home in it and fled the scene. He attempted to establish an alibi by later going to work. The Gor-dons’ car was found in a parking lot near *170 Freeman’s apartment. Freeman’s fingerprint was found on the car and blood that was consistent with that of Sylvia Gordon and Mary Gordon was also in the car. Additionally found in the car was a butcher knife that had been cleaned of blood. The butcher knife was examined by an expert in trace evidence with the Department of Forensic Sciences and was determined to be consistent with having caused the wounds to Mary Gordon, to cut the bra and panties of Mary Gordon, and to cut the jeans of Sylvia Gordon.
“When the police arrived at Freeman’s apartment, Freeman answered the door, and the officers noted a bandage on Freeman’s right hand. When asked how he cut his hand, Freeman lied, claiming that he had cut his hand while repairing a chair. Freeman was arrested at his apartment. The police, upon a consent to search, found the clothing worn by Freeman, which had blood consistent with that of Sylvia Gordon on them. A mixture of blood and semen was found in the underwear that he had worn. His shoes were seized and compared to the prints found on the shirt of Mary Gordon and the card found in the Gordon home. Examination revealed that Freeman’s shoes were consistent with the prints found at the scene. Bite marks were noted on Freeman’s arm, which were [determined to have been] made by Sylvia Gordon.
“Freeman initially lied to the police as to his involvement in the crimes. He tried to establish an alibi for his whereabouts. However, when confronted with the evidence, Freeman admitted to stabbing Sylvia Gordon and stated that upon Mary Gordon’s entering the home he had no choice but to stab her. Freeman also claimed to have blacked out on two occasions during the crimes.
“In late 1988 and early 1989 Freeman was mentally evaluated by the staff at Taylor Hardin Secure Medical Facility, who found that he suffered no mental disease or defect which caused him to lack the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. In 1995, he was evaluated by Dr. Guy Renfro, an expert forensic psychologist, who also found [that] he was responsible for his acts at the time of the offense.”
(C. 1224-27.) The trial court’s findings in its sentencing order were supported by the evidence presented at trial.
On appeal from his convictions, Freeman raises 16 issues, most of which he did not raise by objection in the trial court. Because Freeman was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against Freeman as to any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
This court has recognized that “ ‘the plain error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” ’ ” Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) *171 (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). Accordingly, we will address the issues raised by Freeman on appeal.
I.
Freeman contends that the trial court erred in failing to conduct a competency hearing to determine whether he was competent to stand trial. This claim was never presented to the trial court; therefore, our review will be under the plain error rule. Rule 45A, Ala.R.App.P.
The record reflects that the trial court granted Freeman’s pretrial motion for a psychological examination to determine whether Freeman was competent to stand trial and to determine whether he was insane at the time of the commission of the murders. Dr. Guy Renfro, a forensic psychologist appointed by the trial court, evaluated Freeman in July 1995 and again in September 1995, and in his evaluation report, he made the following findings concerning Freeman’s competency ■ to stand trial:
“Results of [the Competency to Stand Trial Assessment Instrument (CAI) ] found David Freeman to have the intellectual and psychological skills necessary to understand the charges against him and to assist in the preparation of his defense. He had a good appreciation of the charge[s] against him and the possible penalties which could occur should he be found guilty. He was aware that he could be either sentenced to death or given life without parole if found guilty on the present charge. He seemed to have a somewhat realistic appraisal of possible outcomes in the case. He also understood the role of various individuals involved in the court process. He was aware that the judge was neutral in the case. Mr. Freeman was judged as being mildly impaired in his understanding of court procedure. He stated that he was not aware of the fifth amendment protection against self-incrimination. However, once this was explained to him he did understand the concept that was involved. He possesses the capacity to disclose to his attorney pertinent facts about the offense. Whether he chooses to do so is another matter. He did have an adequate understanding of possible legal defenses. He was able to describe in his own words what an alibi defense or an insanity defense would entail. He also appears to have sufficient intellectual capacity to challenge prosecution witnesses if called upon to do so. There do not appear to be any self-defeating motivations which might cause him to sabotage efforts to defend him. He is judged by this examiner as having a mild risk to exhibit unmanageable behavior. He has been known to become overtly upset in court hearings in the past. This typically has occurred when he has been asked to talk about topics or areas which he does not wish to talk about. It is also noted by this examiner that mild impairments exist in Mr. Freeman’s relationships with his attorneys. He is posing some difficulty in communicating with them at this time. These difficulties appear to be a reflection of Mr. Freeman’s characteristic way of relating to others. Mr. Freeman apparently likes to feel in control and also likes to receive attention from others. He does not respond well when others place demands on him. Apparently he perceives that his present attorneys have placed demands on him that he is not willing to meet. More specifically, he is reporting that his attorneys are asking him to communicate more directly about pertinent information relating to the alleged crime rather than spending a lot of time with him and allowing him to relate the material in his own fashion. There was also a mild impairment in his understanding of what a guilty plea would involve. He showed some suspiciousness indicating that he had heard from other defendants that attorneys and others will go behind a particular individual’s back in *172 order to do favors for each other. This appears to be a repetition of jailhouse rumor rather than reflecting a true delusional belief. Mr. Freeman does appear to have the intellectual and verbal skills necessary to testify if called upon to do so. However whether he would choose to respond to direct questioning is again another matter.
“In summary, the longstanding personality characteristics exhibited by Mr. Freeman may make him a somewhat difficult person to work with at times. It is likely that he will need to feel in control of situations and may have a tendency to feel rejected if individuals disagree with him. This may lead to his becoming angry and refusing to cooperate for a period of time. However, this does not appear to be a result of a true mental disease or mental illness. It does appear to be a situation which is under Mr. Freeman’s voluntary control. Despite these limitations, it is this examiner’s opinion that David Freeman is competent to stand trial in the current case.”
(C. 3470-71.) Dr. Renfro also found that Freeman did not suffer from a mental disease or defect, either at the time of the murders or at the time of- Dr. Renfro’s evaluation, that would affect his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Dr. Renfro’s findings concerning Freeman’s competency to stand trial and his mental state at the time of the murders were consistent with the findings of the Lunacy Commission in its psychiatric evaluation of Freeman performed shortly after the murders in December of 1988.
We have said that “[i]t is the burden of a defendant who seeks a pretrial competency hearing to show that a reasonable or bona fide doubt as to his competency exists.” Woodall v. State, 730 So.2d 627, 647 (Ala.Cr.App.1997), aff'd in relevant part, 730 So.2d 652 (Ala.1998). “ ‘The determination of whether a reasonable doubt of sanity exists is a matter within the sound discretion of the trial court and may be raised on appeal only upon a showing of an abuse of discretion.’ ” Id.; see also Tankersley v. State, 724 So.2d 557, 564 (Ala.Cr.App.1998).
Based on the record of the proceedings before us, we do not find that Freeman, either at trial or on appeal, met his burden of showing that a reasonable or bona fide doubt existed as to his competence to stand trial. In his brief to this court, Freeman relates an incident at trial that occurred just before the State rested its case. The record reveals that, the trial court had recessed for lunch, and the deputies were escorting Freeman from the courtroom to eat lunch. Freeman, however, refused to leave without first getting his reading materials. When one of the deputies told Freeman that he did not have time to read at lunch, Freeman became very angry and combative. He threatened the deputies, kicked over the courtroom microphone, and kicked a door. He refused to comply with the deputies’ orders and refused to return to the courtroom after the lunch break.
After Freeman was forced to return to the courtroom, the trial judge told Freeman that he needed to sit still, to which Freeman replied, “Fuck you. I am tired of everybody.” (R. 689.) The trial judge then gave Freeman’s lawyers a few minutes to talk to Freeman alone. After talking to Freeman, Freeman’s trial counsel told the trial court that Freeman was not responsive and that he “seemed totally out of it.” (R. 691.) Freeman’s trial counsel further told the trial court that he thought that Freeman was having “some sort of psychotic-type episode.” (R. 695.) The trial court responded that it did not agree with counsel’s interpretation of Freeman’s behavior. The trial court stated that Freeman “certainly did not seem to be out of touch with reality. He just seemed to be uncooperative.” (R. 695.) The trial court informed Freeman that if he did not conduct himself appropriately, he would be *173 either bound and gagged or removed from the courtroom. There were no further disruptions or outbursts by Freeman for the remainder of the trial.
We do not find that this incident established a reasonable or a bona fide doubt as to Freeman’s mental capacity to stand trial. Instead, we agree with the trial court’s characterization of Freeman’s behavior as being simply uncooperative. As the State correctly points out in its brief to this court, Dr. Renfro’s findings in his evaluation report, that as a result of Freeman’s longstanding personality characteristics Freeman was at times difficult to work with and that he felt the need to be in control of situations, accurately described the behavior exhibited by Freeman at trial. Renfro stated in his report that if Freeman felt that he was not in control of a situation, he might become angry and refuse to cooperate for a period of time. However, as Dr. Renfro noted, this behavior did not appear to be the result of a true mental disease or mental illness. Freeman was cooperative throughout his trial until he was not permitted to take his reading materials with him during the lunch recess. He then became uncooperative and angry, but after a short time, returned to being cooperative for the remainder of his trial. We do not find that Freeman’s behavior during trial created a bona fide doubt as to his competency to stand trial. It was the trial judge who, “after hearing the testimony, as well as observing the demeanor and conduct of [Freeman], was in the best position to determine any question of [Freeman’s] competency.” Cliff v. State, 518 So.2d 786, 791 (Ala.Cr.App.1987). The trial court had before it, for its review, a court-ordered psychological evaluation of Freeman conducted shortly before trial, as well as a court-ordered psychiatric evaluation of Freeman performed by personnel at Taylor Hardin Secure Medical Facility conducted shortly after the murders in 1988. Neither evaluation indicated that Freeman was incompetent to stand trial.
Moreover, even assuming that Freeman did in fact suffer from a mental illness and that that mental illness caused him to commit the murders, he “may still be competent to stand trial so long as he has sufficient understanding of the proceedings against him and an ability to aid his counsel in preparation for his defense.” Tankersley, 724 So.2d at 565. Here, there is no evidence that Freeman did not understand the proceedings against him or that he was unable to assist his lawyers in his defense.
For these reasons, we find no error, much less plain error, as to this claim.
II.
Freeman raises several issues concerning the admissibility of his post-arrest statements to police. Freeman did not, however, contest at trial the admission of these statements. As a result, the record before this court is, to say the least, sparse, and fails to provide this court with much of a factual basis on which to review Freeman’s claims. Nevertheless, because we must review Freeman’s claims for plain error, we will, with the record before us, address each of his claims concerning the admissibility of his statements to police.
A.
Freeman contends that his post-arrest statements to police were improperly admitted at trial because, he says, the police continued to question him about the murders after he asserted his right to remain silent, in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The record reveals that Freeman was initially advised of his Miranda rights when he was arrested at his apartment on March 12, 1988. Officer Terry Jett with the Montgomery Police Department testified that after Freeman was taken from the apartment to police headquarters for questioning, he was again advised of his Miranda rights before he was questioned. *174 Jett testified that Freeman acknowledged that he understood those rights, that he signed a waiver to that effect, and that he agreed to talk to the police. In his March 12 statement to Jett, which was also audio-taped, Freeman denied any knowledge of, or participation in, the murders of Mary Gordon and Sylvia Gordon.
The record further reveals that on March 14, 1988, Detective Gary Graves, who at that time was a detective with the Montgomery Police Department and the case agent in charge of the Gordon case, went to the jail to question Freeman and to photograph bite marks on Freeman’s arm. Graves testified that he advised Freeman of his Miranda rights, and that Freeman signed the rights waiver form stating that he understood his rights and that he agreed to waive those rights and talk to the police. Graves testified that he then asked Freeman what happened on the day of the murders. Graves stated that in response to that question, Freeman told him “he couldn’t talk about it.” (R. 598.) In an effort to clarify Freeman’s comment, Graves then said to Freeman, “If you can’t talk about it, can you write it for me?” (R. 599.) Graves testified that Freeman said that he would, and he then proceeded to handwrite two statements denying any involvement in the murders in the first statement, but admitting in the second statement to killing both Mary Gordon and Sylvia Gordon.
Freeman maintains that he invoked his right to remain silent when he told Graves that “he couldn’t talk” about the murders. We do not, as Freeman does, interpret this statement to be a clear and unequivocal invocation of Freeman’s right to remain silent. As we stated in Slaton v. State, 680 So.2d 879 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997):
“The United States Supreme Court has held that police officers must inform people of their constitutional rights before beginning custodial interrogations. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Included in the right to remain silent is a right to cut off questioning. Miranda, 384 U.S. at 474, 86 S.Ct. at 1628. When a defendant invokes his right to remain silent, that request must be ‘scrupulously honored.’ Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).
“This court recently stated that whether someone has invoked his right to remain silent is determined on a case-by-case basis.
“ ‘Whether there was a waiver of the right to remain silent and the right to counsel and whether the confession was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of the accused — the totality of the circumstances.’
“Holmes v. State, 598 So.2d 24, 26 (Ala.Crim.App.1992); see also Thomas v. State, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Magwood v. State, 494 So.2d 124 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
“In this case, the police were questioning an admittedly scared 17-year-old who had just been arrested for murder and rape. He was visibly upset but had given no indication that he did not want to cooperate with the detectives and appeared to be readily responding to their questions. We are not persuaded that Slaton’s response, ‘Oh God, I don’t feel like going through all this,’ was an unequivocal invocation of his right to remain silent. It does not strike us as any kind of conscious request that he be allowed to remain silent. Instead, Slaton’s comment seems a natural outburst borne of the fear and anxiety created by the circumstances in *175 which he found himself. Therefore, we hold that Slaton’s statement was not an invocation of his right to remain silent, that his Miranda rights were not violated, and that his statement was properly used at trial.”
680 So.2d at 886-87. “ ‘Once informed of Miranda rights, an accused has the burden of indicating in some manner his wish to remain silent.’ ” Ex parte Slaton, 680 So.2d 909, 914 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Lightbourne v. Dugger, 829 F.2d 1012 (11th Cir.1987), cert. denied, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988); see also Smith v. State, 756 So.2d 892, 932 (Ala.Cr.App.1998). “When a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of clarifying the equivocal request.” Beard v. State, 612 So.2d 1335, 1341 (Ala.Cr.App.1992) (citations omitted).
Here, Freeman’s response to Graves’s question was not an unequivocal invocation of his right to remain silent. The response, instead, appears to be Freeman’s simply saying that he did not like talking about the brutal murders. Freeman was, however, more than willing to handwrite a statement about the murders. As the State correctly points out in its brief to this court, Freeman’s response to police was not an assertion of his right to remain silent, but instead indicated Freeman’s desire to conduct the interview the way he wanted it conducted. This is further evidenced, as the State also points out in its brief, by Freeman’s refusing to make a videotaped statement, while agreeing to make an audiotaped statement. Jett’s and Graves’s testimony at trial clearly indicated that Freeman wanted to answer their questions. In fact, both Jett and Graves testified that Freeman was cooperative throughout all of the questioning, and that he was responsive to all of their questions. For these reasons, we conclude that Freeman did not indicate that he wished to remain silent; thus, there was no violation of his Miranda rights in this regard.
B.
Freeman further contends that his response to police during questioning, that he “couldn’t talk about” the murders, amounted to a request for an attorney and that, therefore, because the police continued to question him without an attorney present, his statement was obtained in violation of Miranda. We find this claim also to be without merit.
In Ex parte Cothren, 705 So.2d 861 (Ala.1997), cert. denied, 523 U.S. 1029, 118 S.Ct. 1319, 140 L.Ed.2d 482 (1998), the Alabama Supreme Court stated:
“ ‘Invocation of the Miranda right to counsel “requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.” McNeil v. Wisconsin, 501 U.S., at 178 [111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991) ]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning. See ibid. (“[T]he likelihood that a suspect would wish counsel to be present is not the test for applicability of Edwards”); Edwards v. Arizona, [451 U.S. 477] at 485, [101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) ] (impermissible for authorities “to reinterro-gate an accused in custody if he has clearly asserted his right to counsel”) (emphasis added).
“ ‘Rather, the suspect must unambiguously request counsel. As we have observed, “a statement either is such an assertion of the right to counsel or it is not.” Smith v. Illinois, 469 U.S. [91] at 97-98 [105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984) ] ... Although a suspect need not “speak with the discrimination of an Oxford don,” post, at 476, 114 S.Ct., at *176 2364 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect. See Moran v. Burbine, 475 U.S. 412, 433, n. 4, [106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410] (1986) (“[T]he interrogation must cease until an attorney is present only [i]f the individual states that he wants an attorney”) (citations and internal quotation marks omitted).’ ”
705 So.2d at 864, quoting Davis v. United States, 512 U.S. 452, 458-61, 114 S.Ct. 2350, 2354-56, 129 L.Ed.2d 362 (1994) (some bracketed information original; some bracketed information added).
Here, Freeman did not make an unequivocal or unambiguous request for counsel; he made no request at all. Freeman’s response that he “couldn’t talk about” the murders can not be construed to be a request for counsel. Accordingly, we find no error, plain or otherwise, as to this claim.
C.
Freeman also contends that when the police arrived at his apartment on the morning after the murders, they improperly questioned him before advising him of his Miranda rights. The record reveals that when Freeman opened his apartment door, Officer Jett asked him what had happened to his hand, which was covered with a bandage. Freeman told the officers that he had cut his hand on a chair in the apartment. The police then advised Freeman of his Miranda rights, and searched the apartment pursuant to a consent to search from Freeman’s roommate, who was also present at the apartment when the police arrived. Freeman was arrested at that time, but he was not questioned about the murders until he arrived at police headquarters, where he was again advised of his Miranda rights. Freeman argues that because he was not advised of his Miranda rights before the police asked him about his hand, his post-Miranda statements were inadmissible because, he says, they were the “fruits of the poisonous tree.” We do not agree.
Because Freeman was not in custody when the police asked him about his hand, Miranda, which applies only when an individual is subjected to custodial interrogation, is inapplicable in this case. Freeman was not in custody for purposes of Miranda As we stated in Patterson v. State, 659 So.2d 1014 (Ala.Cr.App.1995), in rejecting a similar claim to Freeman’s:
“The appellant asserts that when the officers arrived at his house, he was a suspect in the shooting, that the interrogation inside his residence was custodial in nature, and that the police were required to give a Miranda warning before asking any questions. However, there was no evidence presented that the ‘pre-Miranda ’ questions were anything other than of a general investigative nature. Before asking any potentially incriminating questions, the appellant was given his Miranda warning, Merriweather v. State, 629 So.2d 77 (Ala.Crim.App.1993), and signed a consent to search his house. (R. 14.) The fact that the interrogation occurred inside the accused’s house is a factor tending to indicate that the interview was noncustodial. Henderson v. State, 598 So.2d 1045, 1048 (Ala.Crim.App.1992). See also, United States v. Phillip, 948 F.2d 241 (6th Cir.1991), cert. denied, 504 U.S. 930, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992) (no custody when no restraint on freedom of movement to degree associated with formal arrest); United States v. Hocking, 860 F.2d 769 (7th Cir.1988) (no custody when interview conducted in home in polite tone and suspect not compelled to answer questions or restrained from ter *177 minating interview, despite suspect’s heart condition and mature age and agent’s open disbelief of suspect’s denials). ‘ “It is the compulsive aspect of custodial interrogation, and not the strength or content of the officer’s suspicions at the time the questioning was conducted, which led the Court to impose the Miranda requirements with regard to custodial questioning.” Finch v. State, 518 So.2d 864, 867 (Ala.Cr.App.1987).’ Lemley v. State, 599 So.2d 64, 71 (Ala.Crim.App.1992). ‘The Court has “explicitly recognized that Miranda warnings are not required ‘... because the questioned person is one whom the police suspect.’ ” California v. Beheler, 463 U.S. [1121] at 1125, 103 S.Ct. [3517] at 3520, 77 L.Ed.2d 1275 [ (1983) ] (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)).’ Finch v. State, 518 So.2d 864, 867 (Ala.Crim.App.1987).”
659 So.2d at 1016; see also Jackson v. State, 412 So.2d 302, 306-07 (Ala.Cr.App.1982) (Miranda warnings not required when police officers, who were conducting a general on-the-scene investigation of a recent homicide, asked accused, “What happened?”); Truex v. State, 282 Ala. 191, 192, 210 So.2d 424, 425 (1968) (Miranda not implicated when police officer asked suspect at scene of homicide, “What happened?”).
Here, Officer Jett’s inquiry of Freeman at his apartment was investigatory rather than accusatory and, therefore, it was not necessary to give a Miranda warning before making the inquiry. “ ‘[I]n the absence of “compelling influences, psychological ploys, or direct questioning,” the “possibility” that an accused will incriminate himself, and even the subjective “hope” on the part of the police that he will do so, is not the functional equivalent of interrogation.’ ” Buchannon v. State, 652 So.2d 799, 802 (Ala.Cr.App.1994), quoting Gilchrist v. State, 585 So.2d 165, 175 (Ala.Cr.App.1991). Moreover, the question did not necessarily call for an incriminating response, and obviously, did not invoke one from Freeman. Freeman’s response, that he had cut his hand on a chair, was clearly not incriminating.
For these reasons, we find no error, much less plain error, as to this claim.
D.
Freeman’s final claim of alleged error concerning the admission of his post-arrest statements is that because he allegedly suffers from a “schizotypal personality disorder and major depression,” he was incapable of making an intelligent waiver of his Miranda rights and voluntarily making his statements. Freeman offers nothing in his brief to show that his waiver was anything but voluntary, other than the general, conclusory statement that his mental impairment prevented him from knowingly and voluntarily waiving his rights.
“An accused’s alleged mental condition alone will not prevent a statement from correctly being received into evidence at trial.” Wheeler v. State, 659 So.2d 1032, 1034 (Ala.Cr.App.1995). In Wheeler, we stated:
“ ‘Any mental impairment, short of mania or such impairment of the will and mind that an individual becomes unconscious of the meaning of his words, will not render a statement or confession inadmissible. The determination of whether a confession was voluntarily made is to be based upon a consideration of the “totality of the circumstances.” Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). “Mental abnormality of an accused is only one factor to be considered in determining from the totality of the circumstances the voluntariness and admissibility of a confession. Corbin v. State, 412 So.2d 299 (Ala.Cr.App.1982); Shorts v. State, 412 So.2d 830 (Ala.Cr.App.1981).” Baker v. State, 472 So.2d 700, 703 (Ala.Cr.App.1985).’ ”
*178 659 So.2d at 1035, quoting McCord v. State, 507 So.2d 1030, 1033 (Ala.Cr.App.1987).
Our review of the record convinces us that Freeman knowingly, voluntarily, and intelligently waived his rights. During questioning by both the State and Freeman’s trial counsel, the interrogating officers testified that Freeman was cooperative throughout the questioning, that he was responsive to all of their questions, and that there was nothing unusual about his appearance and demeanor. The officers also testified that when he made the statements Freeman exhibited normal behavior and speech, and that he appeared to know what he was doing.
Freeman’s claim that his statements were not voluntary appears to be based on the diagnosis of his expert psychological witness, Dr. Barry Burkhart. However, as the State correctly points out in its brief to this court, “such a position ignores the conclusions of the team of psychiatrists who conducted the forensic evaluation [of Freeman] at Taylor Hardin [Secure Medical Facility]” and the psychiatric evaluation conducted on Freeman before the present trial by the court-appointed psychologist, Dr. Guy Renfro. The psychiatrists at Taylor Hardin and Dr. Renfro both found that Freeman did not suffer from any mental disease or defect at the time of the murders. (State’s brief, p. 49.)
There was no evidence before the trial court to suggest that it should have, sua sponte, refused to admit Freeman’s statements because he was incapable of voluntarily waiving his Miranda rights. Although Freeman’s expert psychological witness testified that Freeman suffered from a schizotypal personality disorder and from depression, his testimony in no way indicated that at the time Freeman gave his statements he was unable to understand his rights and to voluntarily waive them. Moreover., as noted above, the expert testimony at trial concerning Freeman’s mental condition was conflicting.
Accordingly, after reviewing the totality of the circumstances, we find that Freeman understood his rights, that he waived those rights, and that he voluntarily gave statements to police. For these reasons, we find no error, plain or otherwise, as to this claim.
III.
Freeman contends that his arrest in his apartment without an arrest warrant was illegal; therefore, he says, his statements to police after his arrest and the items recovered as a result of the search of his apartment, which included the bloodstained clothes Freeman was wearing when he murdered the Gordons, were improperly admitted at trial because, he maintains, they were the “fruits of an illegal arrest.” (Freeman’s brief, p. 39.)
Initially we note that Freeman did not challenge at trial the legality of his arrest; therefore, as was the case with Freeman’s claims concerning the admissibility of his statements, our review is confined to the facts contained in the record before us. We have reviewed Freeman’s claim pursuant to the plain error rule and find it to be without merit.
In support of his claim, Freeman relies principally on Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In Payton, the United States Supreme Court held that the Fourth Amendment prohibits the police from making a warrantless, nonconsensual entry into a suspect’s residence in order to make a routine felony arrest. “ ‘The consent necessary in Payton context is consent to enter, not consent to arrest.’ ” Fortenberry v. State, 545 So.2d 129, 137 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990), quoting United States v. Briley, 726 F.2d 1301 (8th Cir.1984); see also Smith v. State, 727 So.2d 147 (Ala.Cr.App.1998), aff'd, 727 So.2d 173 (Ala.1999).
Here, the record reveals that at 6:45 a.m. on March 12, 1988, the morning after *179 the murders, the police went to an apartment at 443 South Court Street after receiving information, the nature of which is not contained in the record on appeal, to look for Freeman. Officer Terry Jett testified that he and several other officers went to the residence and knocked on the door. Freeman answered the door and Jett advised him of his Miranda rights. Jett further testified that Henry Peak, who was also at the residence, identified himself as the “owner” of the apartment. Jett stated that Peak consented to a search of the apartment. The consent-to-search form is contained in the record on appeal and is signed by Peak. It reveals that Peak voluntarily consented to a search of his residence at 443 South Court Street, Apartment A.
Jett testified that after he read Freeman his rights and obtained the consent to search from Peak, Freeman remained in the hallway of the apartment building with another police officer, while Jett searched the apartment. Jett testified that he saw some clothing, which appeared to be stained with blood, on the floor of a closet. According to Jett, the closet in which the clothes were found was in the “main room” of the apartment, and the door to the closet was open. Apparently, the “main room” of the apartment was being used as a bedroom. Jett testified that after the search of the apartment, Freeman was arrested and taken to police headquarters for questioning.
The record further reveals, according to one of Freeman’s post-arrest statements to police, that Henry Peak rented the apartment at 443 South Court Street, and that Peak was Freeman’s “roommate.” (C. 3205.) Freeman also told police that he had just moved into the apartment “a couple of days” before the murders, and that he had not paid Peak any money towards rent. (R. 3205.)
The evidence indicating Peak’s voluntary consent to search the apartment was undisputed. As we stated in Fortenberry v. State, supra, “ ‘ “the consent of one who possesses common authority over the premises ... is valid as against the ... nonconsenting person with whom the authority is shared.” ’ ” 545 So.2d at 137, quoting United States v. Purham, 725 F.2d 450, 455 (8th Cir.1984). We have also stated, in Colbert v. State, 615 So.2d 1213 (Ala.Cr.App.), rev’d on other grounds, 615 So.2d 1218 (Ala.1992):
“Anyone with a reasonable expectation of privacy in the place being searched can consent to a warrantless search. United States v. Yarbrough, 852 F.2d 1522, 1533-34 (9th Cir.), cert. denied, 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988). Any person with common authority over, or other sufficient relationship to the place or effects searched can give valid consent. United States v. Bertram, 805 F.2d 1524, 1528 (11th Cir.1986).
“Here, the police officers received consent to search the apartment from the appellant’s roommate, Earle Cram-er. Cramer freely and voluntarily gave his consent to search the apartment. Mr. Cramer signed a form giving the officers consent to search the entire premises. Therefore, it is not necessary for the officers to procure a search warrant, and the evidence seized during the search was admissible against the appellant to the same extent that it would have been against Mr. Cramer. McLoyd v. State, 390 So.2d 1115, 1116 (Ala.Cr.App.1980).
[[Image here]]
“The trial court was correct in overruling the appellant’s motion to suppress evidence of the contents of the apartment where the appellant was living with a cotenant who gave his consent to the search of the apartment.”
615 So.2d at 1214A15. “[T]he authority of a third person to consent to a search turns on whether the third person and the defendant ‘mutually used the property searched and had joint access to and control of it for most purposes so that it is reasonable to *180 recognize that either user had the right to permit inspection of the property and that the complaining co-user had assumed the risk that the consenting co-user might permit the search.’ ” Smiley v. State, 606 So.2d 213, 215 (Ala.Cr.App.1992), quoting United States v. Rizk, 842 F.2d 111, 112-13 (5th Cir.), cert. denied, 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988); see also Rieber v. State, 663 So.2d 985, 990 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).
Here, Peak, who either leased or owned the apartment where Freeman was staying, and who, according to Freeman, was Freeman’s roommate, clearly had the authority to consent to the search of the apartment. He voluntarily gave his written consent for the police to search the entire apartment; therefore, because Pay-ton concerned a factual situation different from the factual situation in the present case, i.e., a warrantless and nonconsensual entry into a suspect’s residence, we find no merit to Freeman’s argument that his statements to police and the evidence seized pursuant to what was a consensual search were improperly admitted at his trial.
We do not mean to imply by our holding that the police did not have the requisite probable cause to support an arrest of Freeman in his residence. Due to the paucity of the record before us, we do not know what facts and circumstances concerning the crime and Freeman’s involvement in the murders were known to the officers at the time of Freeman’s arrest. However, given our finding that there was a search for which there was valid consent, we need not reach that issue. Accordingly, for the reasons above, we find no error, much less plain error, as to this claim.
IV.
Freeman contends that the trial court erred in instructing the jury that it had already determined the voluntariness of Freeman’s statements to police. The record shows that during its oral charge to the jury, the trial court instructed the jury as follows:
“Indeed, it is not my job to decide in this case what evidence is or is not important to you. My job is to decide if it meets the legal requirements to be admitted, and it is your job to decide what evidence is worthy and important, what weight, if any, to be given to the evidence in reaching your verdict.
“If you believe from the evidence that David Freeman was a weak-minded person at the time he made statements to the police, you may consider that fact in determining the weight of such statements.
“With regard to an alleged confession or statement by the defendant, you may consider all the facts and circumstances surrounding the taking of the alleged confession or statement in determining the weight or credibility, if any, which you give to the alleged confession or statement. In exercising your exclusive prerogative of determining the credibility of the evidence or the weight to be given to the evidence in this case, you should consider all the circumstances under which the alleged confession was obtained and the appliances by which it was supposedly elicited, including the situation and the mutual relationship of the parties.
“And finally, while the Court determines the voluntariness of the confession, the jury is to determine the weight or credibility and may disregard an alleged confession which is unworthy of belief or in which they entertain a reasonable doubt as to its truth.”
(R. 1231-33.) Freeman did not object to the above-quoted instructions; thus, we will review his claim under the plain error rule, that is, we must determine whether the error “has or probably has adversely affected the substantial right of the appellant.” Rule 45A, Ala.R.App.P.
*181 “[W]hether a confession was voluntary rests initially with the trial court; once the trial judge makes the preliminary determination that the confession was voluntary, it then becomes admissible into evidence. Thereafter, the jury makes a determination of voluntariness as affecting the weight and credibility to be given the confession.” Ex parte Singleton, 465 So.2d 443, 446 (Ala.1985). “It is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible.” Singleton, 465 So.2d at 446. Here, however, the trial court’s instructions were clear in stating that it was the jury that would ultimately determine the voluntariness of Freeman’s statements.
Although the trial court told the jury that it had made the initial determination as to the voluntariness of Freeman’s statements, the court made clear to the jury that it was ultimately to decide the weight and credibility to be given Freeman’s statements and that, therefore, it was to make the ultimate determination as to the voluntariness of the statements. See Ex parte Gaddy, 698 So.2d 1150, 1158 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997). While the trial court may have erred by telling the jury that it had made an initial determination of the voluntariness of Freeman’s statements, nothing in the trial court’s instructions indicated that the jury should believe Freeman’s statements simply because the trial court had determined them to be voluntary. See Clark v. State, 621 So.2d 309, 325 (Ala.Cr.App.1992). Nor did the instructions indicate that the jury played no role in determining the voluntariness of the statements. Id. Further, the trial court informed the jury that it could disregard the statements if it found them to be unworthy of belief or if it entertained a reasonable doubt as to their truth. Thus, the trial court’s instructions did not incorrectly inform the jury of the applicable law concerning the voluntariness of statements, did not affect a substantial right of Freeman, and did not constitute prejudicial error, much less plain error. As the Alabama Supreme Court stated in Ex parte Gaddy, supra:
“This case is unlike Bush [v. State, 523 So.2d 538 (Ala.Cr.App.1988) (where the trial court committed plain error by specifically charging the jury that it was not entitled to disregard the fact that the trial court had admitted into evidence Bush’s confession) ], because in this case the judge simply charged the jury that he had made an initial determination that the confession was voluntary. Although the judge erred in doing so, he also specifically told the jury that it was to determine the issue of ‘weight or credibility’ of the confession and that it was free to ‘disregard the defendant’s statements which you deem to be unworthy of belief or in which you entertain a reasonable doubt as to its truth.’ As this Court and the Court of Criminal Appeals have held, if the circuit court makes it clear in its instruction that the jury was ‘to ultimately determine whether the confession was voluntary,’ then the error in instructing the jury that the court had already made a determination of voluntariness may be found to be harmless. Singleton [v. State, 465 So.2d 443] at 446 [(Ala.1985)]; see Aultman [v. State, 621 So.2d 353] at 355 [(Ala.Cr.App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993)], and Clark [v. State, 621 So.2d 309 at 324 (Ala.Cr.App.1992)]. The jury was informed that it could disregard Gaddy’s confession entirely if it decided to give no weight to the confession or if it found the State’s witnesses to be unworthy of belief.
“Again, because Gaddy did not object to the giving of the instruction, we review the instruction only for plain error. We strongly reiterate that the instruction given by the judge was erroneous, because a judge should not inform the jury that the judge has already determined the confession to be voluntary. Singleton, supra. In some cases, like *182 Bush, supra, the charge can be so misleading or the circumstances can be such that the error will not be harmless. While we agree with Gaddy that the instruction was partially erroneous, we hold that the error does not rise to the level of ‘plain error’ that would justify a reversal of his conviction.”
698 So.2d at 1158.
Here, as in Ex parte Gaddy, any error in the trial court’s instructions to the jury was harmless error, at most, and certainly did' not amount to plain error. See Jackson v. State, 674 So.2d 1318, 1325-26 (Ala.Cr.App.1993), aff'd in relevant part, 674 So.2d 1365 (Ala.1994) (the trial court’s instructions that it had initially determined the voluntariness of the defendant’s statements were not plain error where the jury was properly instructed as to its role in considering the statements).
V.
Freeman also contends that the trial court’s instructions on insanity effectively deprived him of an insanity defense. As best as we can discern, the only specific complaint Freeman makes in his brief to this court is, that by instructing the jury that a mental disease or defect does not include an abnormality manifested only by a defendant’s repeated criminal or antisocial conduct, the trial court deprived Freeman of an insanity defense. (R. 1254-55.) Freeman argues that the “outward manifestation of insanity, particularly for the poor, may be criminal, antisocial, immoral, or mean” and that a mental disorder “may be characterized almost entirely by repeated criminal or antisocial conduct.” (Freeman’s brief, p. 63.) Freeman is presenting this claim for the first time on appeal; therefore, our review will be pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
Section 13A-3-1, Ala.Code 1975, provides the following concerning insanity as a defense in a criminal case:
“(a) It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
“(b) ‘Severe mental disease or defect’ does not include an abnomiality manifested only by repeated criminal or otherwise antisocial conduct.
“(c) The defendant has the burden of proving the defense of insanity by clear and convincing evidence.”
(Emphasis added.)
Clearly, the trial court’s instruction to the jury was in accordance with § 13A-3-1 and was therefore proper. That section clearly was intended to exclude from the definition of “severe mental disease or defect” repeated criminal or otherwise antisocial conduct. See Click v. State, 695 So.2d 209 (Ala.Cr.App.1996), cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997); McFarland v. State, 581 So.2d 1249 (Ala.Cr.App.1991). The trial court’s instruction did not, as Freeman claims on appeal, deprive him of an insanity defense. We find no error, much less plain error, as to this claim.
VI.
Freeman also contends that the trial court erroneously instructed the jury on the element of intent. Specifically, he argues that the trial court, by instructing the jury that it “may infer that a person intends the natural consequences of what he does if the act is done so intentionally,” improperly shifted to him the burden of proving that he did not have the requisite intent. Freeman maintains that this portion of the trial court’s instructions on intent violated the United States Supreme Court’s holding in Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). He presents this issue for the first time on appeal. In fact, as the State correctly points out in its brief to *183 this court, the instruction he now complains of on appeal was included as part of the transcript of Freeman’s previous trial that Freeman submitted to the trial court for his requested instructions on insanity. (C. 1043; R. 1119-20.) Therefore, we will review this claim under the plain error rule. Rule 45A, Ala.R.App.P. We find no merit to Freeman’s claim.
In Hart v. State, 612 So.2d 520, 529 (Ala.Cr.App.1992), aff'd, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), we addressed and rejected a claim similar to Freeman’s. In that case, we stated:
“In Sandstrom [v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) ], the Supreme Court held that instructions which a reasonable jury could interpret as an ‘irrebuttable direction by the court to find intent’ violate a defendant’s due process rights. Sandstrom, 442 U.S. at 517[, 99 S.Ct. 2450]. The complained-of instruction in Sandstrom was as follows: ‘[T]he law presumes that a person intends the ordinary consequences of his voluntary acts.’ The instruction in Sandstrom created a ‘mandatory presumption.’
“In DeRamus v. State, 565 So.2d 1167 (Ala.Cr.App.1990), the trial court gave a similar instruction to the jury as the one involved in the instant case. The instruction stated, ‘ “[Intent] may be inferred from the character of the assault, the use of a deadly weapon or any other circumstances.” ’ 565 So.2d at 1170.
We stated that this instruction created a ‘permissive inference,’ and was not error.
“ ‘ “A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive reference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion.” Francis v. Franklin, 471 U.S. [307] at 314, 105 S.Ct. [1965] at 1971 [, 85 L.Ed.2d 344 (1985) ]. A permissive inference only violates the Due Process Clause “if the suggested conclusion is not one that reason and common sense justify in light of the facts before [the] jury.” 471 U.S. at 314, 105 S.Ct. at 1971.’
“565 So.2d at 1170. The cited instruction in the instant case created a permissive inference. ‘The specific language cited by the appellant could not reasonably have been understood as creating a presumption which relieved the State of its burden of proof on the element of intent.’ 565 So.2d at 1170.”
Here, the trial court’s instructions on intent did not create a “mandatory presumption,” but instead created a “permissive inference,” which suggested to the jury only a possible conclusion to be drawn from the evidence, not one that it was required to draw. The instruction “ ‘could not reasonably have been understood as creating a presumption which relieved the State of its burden of proof on the element of intent.’ ” Hart, 612 So.2d at 529, quoting DeRamus v. State, 565 So.2d 1167, 1170 (Ala.Cr.App.1990). Accordingly, we find no error, plain or otherwise, here.
VII.
Freeman further contends that the prosecutor engaged in numerous acts of misconduct at both the guilt and the penalty phases of his trial. Initially we note that Freeman did not object to any of the alleged instances of misconduct. “ ‘This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ ” Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 *184 S.Ct. 201, 98 L.Ed.2d 152 (1987). Thus, we must consider whether any of the prosecutor’s comments complained of on appeal constituted plain error. Rule 45A, Ala. R.App.P.
This court has stated that “[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.” Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). “In judging a prosecutor’s closing argument, the standard is whether the argument ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ” Bankhead, 585 So.2d at 107, quoting Darden v. Wainmight, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). “A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.” Roberts v. State, 735 So.2d 1244, 1253 (Ala.Cr.App.1997), aff'd, 735 So.2d 1270 (Ala.1999). Moreover, “statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.” Bankhead, 585 So.2d at 106. “Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App.1978), and that court is given broad discretion in determining what is permissible argument.” Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.
We note that the trial court repeatedly instructed the jury in this case that the comments and argument of the lawyers were not evidence to be considered by the jury in reaching a verdict or in recommending a sentence. (R. 394, 1168, 1186, 1202 (guilt phase); 1289, 1290 (penalty phase)).
A.
Freeman contends that the following comments by the prosecutor during closing argument at the guilt phase of his trial were improper:
“Sylvia Gordon, 17-year-old girl, senior in high school. She was in LAMP [Lanier Academic Motivational Program, a high school honor’s program]. She had a future. She had a promise. She had her whole life to live. She had just begun to live, nowhere close to reaching her potential.
“Mary Gordon wanted to do the best she could do. She did everything she could to provide for her children. She was alone. She had to be mother; she had to be father; she had to be everything, and she did a good job. She had Debbie [her older daughter], who worked hard, manager of a TOBY [a yogurt shop], gone through college, graduated high school, went through C-Pac, made the honors program. Sylvia, as we said, in the honor’s program at LAMP. She did what she could. She worked so hard, as the testimony has shown, she was tired all the time. All she wanted to do was rest, if she could get a chance. And on Friday when the weekends come, when she comes home, home — think about this folks — her home, the place where she is the most comfortable, where she can be herself, where she can relax, she can unwind. And what she walks into is the worst nightmare that any parent can see, her own child helpless, dying, bleeding at *185 the hands of this man. And why? Because he couldn’t get what he wanted.”
(R. 1155-57.) Freeman argues that the prosecutor’s comments about the victims were prejudicial because, he says, they were designed to create sympathy for the victims. After reviewing the comments in the context of the prosecutor’s entire closing argument, we find no error, plain or otherwise.
The record reveals that the prosecutor, through the testimony of Deborah Gordon Hosford, Mary Gordon’s daughter and Sylvia Gordon’s sister, established, without objection, all of the personal information about the victims contained in the prosecutor’s argument that Freeman now claims on appeal was prejudicial. Thus, the prosecutor’s comments about the victims were proper because they were based on evidence presented at trial. See Frazier v. State, 758 So.2d 577 (Ala.Cr.App.1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 728 So.2d 770 (Ala.1998); Smith v. State, 698 So.2d 189 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Whatever is in evidence at trial is considered subject to legitimate comment by counsel. Jenkins v. State, 627 So.2d 1034, 1050 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994). The prosecutor’s remarks about the victims were legitimate comments based on the evidence admitted at trial, or were reasonable inferences to be drawn from that evidence, and did not constitute improper victim-impact argument, as Freeman argues on appeal.
Moreover, even if we were to assume that the prosecutor’s comments were irrelevant and improper, we would find any resulting error harmless. In Smith v. State, opinion on return to remand, 756 So.2d 892, 904 (Ala.Cr.App.1997), we stated, relevant to such a claim:
“ ‘Recently, this Court examined the issue of victim impact evidence in Ex parte Rieber, 663 So.2d 999 (Ala.1995). In Rieber, we acknowledged that testimony regarding a murder victim’s children was not relevant to the issue of the accused’s guilt or innocence and was, thus, inadmissible during the guilt phase of trial; we noted, however, that “a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.” 663 So.2d at 1005. After thoroughly reviewing the record of this present case, we conclude that the limited testimony regarding Ms. Brown’s infant son and the impact of Ms. Brown’s death on her family, and the prosecution’s limited references to such evidence, did not operate to deny Land a fair trial or to prejudice his substantial rights. Thus, we find no reversible error as to this issue.’
“Ex parte Land, 678 So.2d 224, 236 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).”
756 So.2d at 904-05.
We find no evidence that the prosecutor’s comments during closing arguments regarding the victims affected the outcome of Freeman’s trial or otherwise prejudiced Freeman.
B.
Freeman further contends that during closing argument at the guilt phase the prosecutor improperly inflamed the passions of the jury by suggesting that the jurors “should act as the conscience of the community and join a war on crime” by convicting Freeman of the capital offenses with which he wa,s charged. (Freeman’s brief, p. 50.) The unobjected-to portion of the prosecutor’s argument Freeman now complains of on appeal was as follows:
“In this country, in our civilization, we have laws that apply equally across the board. And these laws are our method *186 of protecting ourselves, society feeling safe from those who do what David Freeman did. And when you feel outraged at what he did, it is all right, because that’s the foundation of our civilization, for without laws, none of us are free, none of us. And we come to you to enforce those laws, because there is no where else to go now. Don’t enforce them like David Freeman, giving no one a chance to yell and beg for their lives. Don’t enforce it without ensuring his rights were protected. The State has proven its case. But enforce it fairly. Enforce it firmly. And let him know he is responsible.”
(R. 1210-11.)
“There is no impropriety in a prosecutor’s appeal to the jury for justice and to properly perform its duty.” Price v. State, 725 So.2d 1003, 1033 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998).
“ ‘In Alabama, the rule is that a district attorney in closing argument may make a general appeal for law enforcement. Embrey v. State, 283 Ala. 110, 118, 214 So.2d 567 (1968).
“ ‘This hue of argument is “within the latitude allowed prosecutors in their exhortations to the jury to discharge their duties in such a manner as, not only to punish crime, but to protect the public from like offenses and as an example to deter others from committing like offenses.” Varner v. State, 418 So.2d 961 (Ala.Cr.App.1982); Cook v. State, 369 So.2d 1243 (Ala.Cr.App.1977), affirmed in part, reversed in part on other grounds, 369 So.2d 1251 (Ala.1978)....’”
Kuenzel v. State, 577 So.2d 474, 503 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Ex parte Waldrop, 459 So.2d 959, 962 (Ala.), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); see also Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).
We find that the prosecutor’s comment was clearly a general appeal for law enforcement and justice, and an appeal to the jury to discharge its duties so as to punish Freeman for the commission of his crimes and to deter others from committing similar offenses. The comments did not have the prejudicial effect Freeman says they had. They were a call for justice, not sympathy. See Price, supra.
Freeman also contends that the prosecutor engaged in misconduct when he commented to the jury: “There are very few times in all our lives when we can really do something, we can do justice. I am asking you, on behalf of Sylvia and Mary Gordon, to do justice for them.” (R. 1165.) This comment, like the previous complained-of comment, was clearly a general appeal for law enforcement and justice. See Kuenzel, supra; see also Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992) (it is not reversible error when the prosecutor makes a brief statement that he spoke on behalf of the victims’ family).
Accordingly, we find no error, plain or otherwise, as to the prosecutor’s comments.
C.
Freeman also contends that the “cumulative effect” of the prosecutor’s alleged misconduct during closing argument at the guilt phase deprived him of a fair trial. “Where no single instance of alleged prosecutorial misconduct constitutes reversible error, the cumulative effect of these instances cannot be considered to be any greater.” Mims v. State, 591 So.2d 120, 127 (Ala.Cr.App.1991); see also Hunt v. State, 642 So.2d 999 (Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1994). Because we have concluded that no single instance of the prosecutor’s conduct was improper, *187 any claim that that conduct had a cumulative prejudicial effect on his trial is without merit. See Drinkard v. State, 777 So.2d 225 (Ala.Cr.App.1998).
D.
Freeman further contends that several comments by the prosecutor during his closing argument at the penalty phase were prejudicial and improper. We have reviewed all of the complained-of comments in the context of the entire closing argument, and we find that none of the comments constituted error, plain or otherwise.
Freeman claims that the prosecutor improperly suggested to the jurors that they should act as “the conscience of the community” and impose the death penalty; that they should speak for the people in the community and do what was “right and just”; and that they could make a difference by punishing Freeman for his crimes by recommending the death penalty. (R. 1292-93; 1296-97; 1299-1300.) We have reviewed the prosecutor’s comments in the context of the entire closing argument and find that all of the remarks, like the similar remarks made by the prosecutor at the guilt phase, were general appeals for law enforcement and justice, and appeals to the jury to discharge its duties in such a manner as to punish Freeman for the commission of his crimes and to deter others from committing similar offenses. See Price, supra; Kuenzel, supra. Throughout his closing argument, the prosecutor urged the jury to make its sentence recommendation based on the law and the evidence, not on prejudice, sympathy, or bias for or against Freeman, Sylvia Gordon, Mary Gordon, or Debbie Gordon Hosford. (R. 1292, 1296, 1297, 1300, 1303.) The comments were clearly a call for justice, not sympathy.
Freeman also claims that the prosecutor made improper comments about the victims during his closing argument. In Payne v. Tennessee, 501 U.S.
808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held that victim-impact evidence was admissible for consideration by the jury at the sentencing phase of a capital murder case. “‘[A] prosecutor may present and argue evidence relating to the victim and the impact of the victim’s death on the victim’s family in the penalty phase of a capital trial.’” Hyde v. State, 778 So.2d 199, 213 (Ala.Cr.App.1998), quoting McNair v. State, 653 So.2d 320, 331 (Ala.Cr.App.1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). The prosecutor may also properly refer to the victim’s characteristics at the sentencing stage of a capital case. Payne, 501 U.S. at 824-25, 111 S.Ct. 2597. “The United States Supreme Court’s holding in Payne v. Tennessee, ‘was based in large measure on the premise that this type of evidence related to the harm done by the defendant and, consequently, was a valid consideration in determining punishment to be imposed.’ ” Price, 725 So.2d at 1034, quoting McNair, 653 So.2d at 331.
We have reviewed the prosecutor’s allegedly improper comments about the victims and conclude that those comments were proper comments about the characteristics of the victims and the consequences of Freeman’s cutting short their lives. “ ‘The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered an individual, so too the victim is an individual whose death represents a unique loss to society and, in particular, [to the victim’s] family.’ ” Burgess v. State, [Ms. CR-93-2054, November 20, 1998] - So.2d -, - (Ala.Cr.App.1998), quoting Payne, 501 U.S. at 825, 111 S.Ct. 2597.
Freeman contends that the prosecutor improperly argued to the jury that Freeman “believed in the death penalty.” *188 On appeal, Freeman cites no authority to support his claim that the comments were improper. The complained-of comment, placed in context, was as follows:
“Your have a duty to do justice. And when you vote, look inside and do justice. And none of us in this courtroom can fault you if you are true to your duty. I ask you to do justice in this case.
“I ask you to go back to March 11, 1988, imagine you are there and you are watching him do this. We know one person in this courtroom who believes in the death penalty, who executes at knifepoint, forgetting enes out, forgetting being afraid, forgetting caring that life is precious. He made a choice. Follow the law.”
(R. 1303; emphasis indicates that portion of the argument complained of on appeal.)
We find nothing improper about the prosecutor’s comments. The comments were legitimate comments on evidence presented at trial. Prosecutors may properly comment on inferences from the evidence and may draw conclusions from the evidence based on their own reasoning. As we stated in Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996):
“ While in argument to the jury, counsel may not argue as a fact that which is not in evidence; nevertheless, he may state or comment on proper inferences from the evidence and may draw conclusions from the evidence based upon his own reasoning. Sanders v. State, 423 So.2d 348 (Ala.Crim.App.1982); Speigner v. State, 369 So.2d 39 (Ala.Crim.App.), cert. denied, 369 So.2d 46 (Ala.1979); Liner v. State, 350 So.2d 760 (Ala.Crim.App.1977). The prosecutor, as does defense counsel, has a right to present his impressions from the evidence. Sanders, supra; Hayes v. State, 395 So.2d 127 (Ala.Crim.App.1980), cert. denied, 395 So.2d 150 (Ala.1981); McQueen v. State, 355 So.2d 407 (Ala.Crim.App.1978). He may argue every legitimate inference and may examine, collate, shift and treat the evidence in his own way. Sanders, supra; Hayes, supra; McQueen, supra. Liberal rules are allowed counsel in drawing inferences from the evidence in their argument to the jury, whether they are truly drawn or not. Sanders, supra; Liner, supra; Smith v. State, 344 So.2d 1239 (Ala.Crim.App.), cert. denied, 344 So.2d 1243 (Ala.1977). Control of closing argument rests in the broad discretion of the trial judge and, where no abuse of discretion is found, there is no error. Thomas v. State, 440 So.2d 1216 (Ala.Crim.App.1983); Robinson v. State, 439 So.2d 1328 (Ala.Crim.App.1983); Elston v. State, 56 Ala.App. 299, 321 So.2d 264 (1975). The trial judge can best determine when discussion by counsel is legitimate and when it degenerates into abuse. Hurst v. State, 397 So.2d 203 (Ala.Crim.App.), cert. denied, 397 So.2d 208 (Ala.1981); Garrett v. State, 268 Ala. 299, 105 So.2d 541 (1958).’ ”
666 So.2d at 64, quoting Sasser v. State, 494 So.2d 857, 859-60 (Ala.Cr.App.1986).
The prosecutor’s comments were clearly legitimate inferences drawn from the evidence and were also proper responses to the arguments of Freeman’s trial counsel designed to persuade the jury to sympathize with Freeman. We find no error, plain or otherwise, as to this claim.
Freeman also contends that the prosecutor improperly suggested to the jury that if it did not vote to impose the death penalty, the jury would owe Debra Gordon Hosford, Sylvia Gordon’s sister and Mary Gordon’s daughter, an apology. The prosecutor argued the following to the jury:
“You know, the law passed by the legislature, it guides us all. Let it guide you today. Don’t make your decision based on prejudice, bias, sympathy for or against the defendant, Mary Gordon, *189 Sylvia Gordon, or Debbie [Gordon] Hos-ford. Go by the law. Go by what is right.

“The defendant would have you forget what happened March 11, 1988. The defendant would have you think, Well, gee, he made a juvenile mistake, ’ and so you ought to pardon him for this. You ought to say, Well, we won’t punish you so hard.’ What are you going to do? ‘Debbie, I am sorry. I am sorry, Debbie, but your mother and your sister were butchered. He didn’t have a big bad record, so we didn’t think the ultimate punishment in this case was enough.’ It was the right thing to do. What are you going to say? ‘Debbie, he might have had a mental problem sometime and had a tough life. Even though he butchered your mother and your sister, we don’t think the death penalty is right. Debbie, he might have been under duress or domination of somebody, I don’t know who, but somebody out there might have made him do this so it is okay. ’ Debbie, the only person there that made him do anything was in total control, was David Freeman himself.

“And then they argue to you something about disregarding the law. The Judge is going to read you the law. Listen. It is the same words. You have already found it. Substantial capacity, ability to conform, under some kind of duress. It is the same thing. And he wants you to pretend like it is different. No, that is another lie.
“And, lastly, I guess he wants you to say to Debbie, ‘Debbie, he was only 18.’ I am sorry. Only 18. We are going to forget what he did. Now he is a grown man.”
(R. 1300-02; emphasis indicates that portion of the argument complained of on appeal.)
The prosecutor’s argument, contrary to Freeman’s claim on appeal, did not suggest to the jury that it should vote for the death penalty based simply on sympathy for the victims or for the victims’ family. The prosecutor was simply arguing to the jury that the mitigating circumstances argued by Freeman, even if proven, were outweighed by the aggravating circumstances. The prosecutor urged the jury to follow the law in making its sentencing recommendation. It did not urge the jury to base its recommendation on sympathy for the victims’ family. We find no error, much less plain error, here.
Lastly, Freeman contends that the prosecutor improperly referred to Freeman’s juvenile record during his closing argument. We have reviewed the prosecutor’s comments and find them to be nothing more than the prosecutor’s arguing to the jury that the mitigating circumstances argued by Freeman to exist deserved little weight in this case. Freeman’s juvenile records were properly before the jury in support of Freeman’s defense that he suffered from a mental disease or defect at the time of the murders. The defense argued many aspects of Freeman’s juvenile record in an attempt to establish several mitigating circumstances. Thus, the prosecutor properly referred to certain aspects of Freeman’s juvenile history in arguing that the mitigating circumstances deserved little weight in his case and that they were outweighed by the aggravating circumstances. The prosecutor may properly argue legitimate inferences to be drawn from the evidence. We find no error, plain or^ otherwise, as to this claim.
VIII.
Freeman contends that the evidence presented by the state was insufficient to support his capital murder convictions for the robbery-murders of Sylvia Gordon and Mary Gordon. See § 13A-5-40(a)(2), Ala.Code 1975. Freeman does not contest the evidence showing that he stabbed and intentionally killed the Gor-dons, and he does not contest the evidence showing that he stole the Gordons’ car. He does, however, contend that the state *190 failed to prove that the murders were committed during the commission of a robbery in the first degree because, he argues, his intent to steal the victims’ car was formed only after he had murdered them. We find no merit to this claim.
“In a challenge of the sufficiency of the evidence, an appellate court must consider the evidence in the light most favorable to the prosecution, and the appellate court will not substitute its judgment for that of the trier of fact.” Maddox v. State, 620 So.2d 132, 133 (Ala.Cr.App.1993). Conflicting evidence presents a jury question not subject to review on appeal, provided that the state’s evidence established a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). A trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983). Furthermore:
“ ‘ “A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust.” ’ ”
McCollum v. State, 678 So.2d 1210, 1215 (Ala.Cr.App.1995), quoting Cox v. State, 500 So.2d 1296 (Ala.Cr.App.1986), quoting other cases.
The state’s evidence, including Freeman’s statements to police, showed that when Freeman entered the Gordons’ house, concealing a knife in his jacket, he intended to kill Sylvia Gordon. In his statement to police, Freeman said that when Mary Gordon entered the house, he had no choice but to kill her. He also said that when he saw the victims trying to get to the telephone, he pulled the telephones off the walls to prevent Mary and Sylvia from calling for help. After brutally killing the Gordons, Freeman placed his bicycle in the trunk of the Gordons’ car, fled the crime scene in the car, and abandoned the car in a parking lot near his apartment.
“The capital crime of the intentional killing of the victim during a robbery or an attempted robbery is a single offense beginning with the act of robbing or attempting to rob and culminating with the intentional killing of the victim. The offense consists of two elements, robbing and intentionally killing. Davis v. State, 536 So.2d 110 (Ala.Cr.App.1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); Magwood v. State, 494 So.2d 124 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
“ ‘As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), “the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.” Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App.1978), aff'd in pertinent part, 370 So.2d 723 (Ala.1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App.1984). To sustain any other position “would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.” Thomas v. State, 460 So.2d 207, 212, (Ala.Cr.App.1983), aff'd, 460 So.2d 216 (Ala.1984).
“ ‘Although a robbery committed as a “mere afterthought” and unrelated to the murder will not sustain a conviction under § 13A-5^0(a)(2) for the *191 capital offense of murder-robbery, see Bufford v. State, [382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980) ]; O’Pry v. State, [642 S.W.2d 748 (Tex.Cr.App.1981)], the question of a defendant’s intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App.1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim’s property and fled. Cobern v. State, 273 Ala. [at] 550, 142 So.2d [at] 871 (1962). The defendant’s intent to rob the victim can be inferred where “[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events.” Thomas v. State, 460 So.2d at 212.... See also Cobern v. State; Crowe v. State; Bufford v. State; Clements v. State.’ ”
Bush v. State, 695 So.2d 70, 118-19 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting Hallford v. State, 548 So.2d 526, 534-35 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), quoting in turn Connolly v. State, 500 So.2d 57, 63 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986).
We find that the evidence, when viewed in the light most favorable to the prosecution, was clearly sufficient to allow the jury to reasonably conclude that the murders of the Gordons and the taking of their car formed a continuous chain of events and, therefore, that the taking of the car was not a mere “afterthought” to the murders. In his statement to police, Freeman said that it took him over an hour to ride his bicycle from his apartment to the Gordons’ house. Certainly, it was reasonable for the jury to conclude that taking the car was part of Freeman’s overall plan to murder the Gordons, leave the crime scene undetected, return to his apartment, change his bloody clothes, and get to work on time in an attempt to establish an alibi. Freeman did, in fact, arrive at work on time, only several hours aftervhe had committed the murders. “ ‘[E]ven if the appellant took the victim’s property when he was in “immediate flight after the attempt or commission,” his actions were still embraced within the statutory scheme for murder committed during a robbery.’ ” Siebert v. State, 562 So.2d 586, 594 (Ala.Cr.App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), quoting Davis v. State, 536 So.2d 110 (Ala.Cr.App.1987), aff'd, 536 So.2d 118 (Ala.1988).
Whether Freeman intended to rob the victims of their car when he killed them was a question for the jury. See Harris v. State, 671 So.2d 125 (Ala.Cr.App.1995); Pierce v. State, 576 So.2d 236 (Ala.Cr.App.1990), cert. denied, 576 So.2d 258 (Ala.1991); Siebert, supra. The evidence certainly supported the reasonable conclusion that the capital offense began when the attack on the victims occurred and was consummated when Freeman fled the Gor-dons’ house in the Gordons’ car; thus, Freeman’s convictions for the capital offense of murder during the course of a robbery were proper.
IX.
Freeman also contends that the evidence was insufficient to support his convictions for the capital offense of murder committed during a burglary because, he says, there was no evidence that Freeman “broke and entered” the Gordons’ house. (Freeman’s brief, p. 29.)
Section § 13A-7-5, Ala.Code 1975, provides, in part:
“(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in *192 immediate flight therefrom, he or another participant in the crime:
“(1) Is armed with explosives or a deadly weapon; or
“(2) Causes physical injury to any person who is not a participant in the crime; or
“(3) Uses or threatens the immediate use of a dangerous weapon.”
Section 13A-7-1(4), Ala.Code 1975, further provides that “[a] person ‘enters or remains unlawfully’ in or upon premises when he is not licensed, invited or privileged to do so.” Under our current burglary statute, the state is no longer required to prove a “breaking and entering”; that common-law element has been replaced with the general requirement that there be an unlawful entry or an unlawful remaining.
In support of his claim, Freeman relies principally on' the Alabama Supreme Court’s decision in Ex parte Gentry, 689 So.2d 916 (Ala.1996). In Ex parte Gentry, the Court overruled a long line of cases that held that evidence of a struggle and a murder inside a victim’s dwelling alone was sufficient to establish that any initial license to enter had been revoked and that, therefore, the defendant had “remainfed] unlawfully” within the meaning of the burglary statute. However, in Davis v. State, 737 So.2d 480 (Ala.1999), the Alabama Supreme Court overruled Ex parte Gentry, holding:
liGentry served a valid purpose in condemning a finding of burglary merely from the commission of a crime that could not be deemed to be within the scope of the privilege to enter. To hold otherwise would have converted every privileged entry followed by a crime into a burglary, thereby running afoul of the constitutional requirement of reserving capital punishment for only the most egregious crimes. Gentry, supra, 689 So.2d at 921. However, in sweeping out mere evidence of the commission of a crime following privileged entry, this Court condemned the use of evidence of a struggle as indicium of revocation of the defendant’s license or privilege to remain. In so doing, the Court swept with too broad a broom.
“Evidence of a struggle that gives rise to circumstantial evidence of revocation of a license or privilege can be used to show an unlawful remaining, a separate prong of the offense of burglary upon which a conviction can be based. We are certainly mindful of the doctrine of stare decisis and recognize that Gentry was decided only fairly recently; nevertheless, this Court must make a course correction if a correction is necessary. To the extent that Gentry is inconsistent with this rule, we overrule it.
“We reiterate that the evidence of a commission of a crime, standing alone, is inadequate to support the finding of an unlawful remaining, but evidence of a struggle can supply the necessary evidence of an unlawful remaining. In homicide cases, the mere fact of the victim’s death cannot be equated with a struggle. For example, evidence of a privileged entry followed by death from an injury inflicted by surprise or stealth and causing instantaneous death would not constitute circumstantial evidence of an unlawful remaining. Likewise, a privileged entry followed by death from an injury inflicted by a delayed mechanism, such as poison, would be equally deficient.
“The evidence was sufficient for the jury to find that Davis killed Harrington [the victim] during a burglary. The evidence of a struggle giving rise to the inference of an unlawful remaining is supplied by Davis’s choice to kill by a less-than-instantaneous technique of strangulation and by his use of three nonfatal stab wounds to the victim’s lower back. Based on the circumstances suggested by the evidence, the jury reasonably could have found that Davis, from the point at which he began committing his criminal acts, ‘remainfed] un *193 lawfully’ in Harrington’s home with the intent to commit a crime.” .
737 So.2d at 483-84. We find that the evidence presented by the State was clearly sufficient to allow the jury to reasonably conclude that Freeman “remain[ed] unlawfully” in the Gordons’ house and, therefore, that his convictions for burglary-murder were proper.
Freeman, who was carrying a knife concealed in his jacket, was waiting on the porch of the Gordons’ house for Sylvia to arrive home. Deborah Gordon Hosford testified that she and Sylvia let Freeman come inside the house only because Sylvia was going to tell Freeman that she did not want to see him anymore. Shortly before the murders, Freeman told a co-worker that Mary Gordon did not like him and that if she was dead, he would have a chance with Sylvia. He also told this same co-worker that he would rather see Sylvia dead than to see her with someone else. In his statement to police, Freeman said:
“[Sylvia’s] mother was coming in the door, I looked at Sylvia then I saw the knife in my hand then I said, ‘I have no other choice,’ so I stabbed her mother. I got cut on my right hand so I wrapped a handkerchief around my hand to stop the bleeding then when I came out of the bathroom I saw both of them trying to get to the phone so I ran over and got all of the phones off the walls then I waited until I knew they weren’t going anywhere before I got the car keys.”
(R. 3223.)
The evidence also showed that the Gor-dons’ house was ransacked. Sylvia was stabbed 22 times; no one single wound was fatal. There was a trail of Sylvia’s blood throughout the house, and her blood was smeared in almost every room of the house. She also had suffered defensive wounds on her hands, and the bite marks on Freeman’s arm, seen by the police after his arrest, were positively identified as having been made by Sylvia. The medical examiner testified that Sylvia survived for approximately eight minutes while she bled to death.
The medical examiner also testified that Mary Gordon survived for five minutes before she died from the 14 stab wounds inflicted by Freeman. According to Freeman’s own statement, Mary Gordon, after being stabbed in the back by Freeman, tried to get away from Freeman by going into her bedroom. Freeman told police that she tried to shut the bedroom door, but he forced his way in. Freeman also told police that both Sylvia and Mary tried to get to a telephone to call for help, but he pulled the telephones off of the walls before they could get to them.
We find that this evidence undoubtedly demonstrated that a violent struggle took place between Freeman and the victims, and that both victims physically resisted Freeman’s assault. Therefore, we conclude that the jury reasonably could have found that the victims revoked their consent to Freeman’s remaining in their house when he “began committing his criminal acts, and thus, that he ‘remain[ed] unlawfully’ in [the Gordons’] home.” Davis, supra at 484.
X.
Freeman contends that his multiple convictions and sentences for the same killings violated constitutional principles of double jeopardy. Because Freeman is presenting this claim for the first time on appeal, we will review it pursuant to the plain error rule. Rule 45A, Ala. R.App.P. We find no merit to Freeman’s contention.
As we stated in Arthur v. State, 711 So.2d 1031 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (Ala.1997):
“In Ex parte McWilliams, 640 So.2d 1015 (Ala.1993) the appellant was charged in a four-count indictment on the capital murder; the fourth count was dropped at the close of the State’s case. The appellant claimed that his rights against double jeopardy were vio *194 lated because, he says, he was charged with and convicted of three counts of capital murder: two counts of murder made capital because it occurred during a robbery and one count of murder made capital because it occurred during a rape. He received one sentence of death. In holding that this double jeopardy claim was without merit, the Alabama Supreme Court stated:
“ ‘In Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the United States Supreme Court addressed the scope of the coverage of the Double Jeopardy Clause, as follows:
“ ‘ “The Double Jeopardy Clause embodies three protections: ‘It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.’ North Carolina v. Pierce [Pearce], 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). The Blockburger [v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932),] test was developed ‘in the context of multiple punishments imposed in a single prosecution.’ Garrett v. United States, 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985).”
“ ‘Grady, 495 U.S. at 516-17, 110 S.Ct. at 2090-91, 109 L.Ed.2d at 561. This Court has also held that the Double Jeopardy Clause of the Alabama Constitution, Art. I, § 9, applies only in the three areas enumerated above. Ex parte Wright, 477 So.2d 492 (Ala.1985).
“ ‘In this case, McWilliams was not prosecuted for the same offense after an acquittal; nor was he prosecuted for the same offense after a conviction. That is, he was not prosecuted twice for the same offense. Moreover, while in King [v. State, 574 So.2d 921 (Ala.Cr.App.1990) ] the defendant received four separate prison sentences for the same offense, McWilliams has only been sentenced to die once and, indeed, can only be put to death once.
“ ‘In the context of prescribing multiple punishments for the same offense, the United States Supreme Court has stated that “the Double Jeopardy Clause 'does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.” Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983).
“ ‘In the present case, it is clear that the jury knew that it was convicting McWilliams of murdering Patricia Reynolds only once. It is also clear that the jury knew that McWilliams’s crime was made capital because his victim was murdered in the course of one robbery and one rape. We conclude, therefore, that the sentencing court has not prescribed a greater punishment than the legislature intended. Even if McWilliams’s rights against double jeopardy had been violated by the two convictions of robbery-murder, the convictions for one count of robbery-murder, the convictions for one count of rape-murder would remain; and either of these would be sufficient to support a death sentence.’
“640 So.2d at 1022.”
711 So.2d at 1075-76.
Here, Freeman was not being prosecuted a second time for the same offense after either an acquittal or a conviction. Nor did Freeman receive separate sentences for each offense. Freeman “ ‘has only been sentenced to die once and, indeed, can only be put to death once.’ ” Arthur, 711 So.2d at 1075, quoting Ex parte McWilliams, 640 So.2d 1015, 1022 (Ala.1993), aff'd. 666 So.2d 90 (Ala.1995), cert. denied, 516 U.S. 1053, 116 S.Ct. 723, 133 *195 L.Ed.2d 675 (1996). Freeman was properly indicted and convicted of six separate and distinct capital offenses involving the murders of Mary and Sylvia Gordon, each requiring proof of an element that the other did not. Accordingly, we find no plain error here.
XI.
Freeman also contends that the trial court erred by failing to instruct the jury that its findings as to mitigating circumstances did not have to be unanimous. In failing to so instruct the jury, he says, the trial court implied that the jurors had to unanimously agree before they could find the existence of a mitigating circumstance. Freeman did not object at trial to the trial court’s instructions to the jury concerning mitigating circumstances; therefore, we will review this claim under the plain error rule. Rule 45A, Ala. R.App.P. We have reviewed the trial court’s instructions to the jury; we find nothing in the instructions that would have suggested to the jurors, or given them the impression, that their findings concerning the existence of mitigating circumstances had to be unanimous. See Coral v. State, 628 So.2d 954, 985 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997).
As we stated in Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), in rejecting a claim identical to Freeman’s:
“In Mills v. Maryland, [486 U.S. 367] at 384, 108 S.Ct. 1860, 100 L.Ed.2d 384 [(1988)], the United States Supreme Court held that a sentence of death must be vacated where ‘there is a substantial probability that reasonable jurors, upon receiving the judge’s instructions ... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.’ Again, no objection was made to the instructions in the trial court.
“Section 13A-5-45(g) provides:
‘“The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.’
“The instructions to the jury in the present case in concerning the manner of establishing the existence of mitigating circumstances were in accordance with § 13A-5-45(g) and the Alabama Pattern Jury Instructions: Criminal. The jury was instructed that the appellant had the burden of interjecting a mitigating circumstance, but once it was interjected the state had the burden of disproving the factual existence of any mitigating circumstance by a preponderance of the evidence. The court gave no instruction suggesting that a finding of a mitigating circumstance had to be unanimous.
“The Alabama Supreme Court addressed this identical issue in Ex parte Martin, 548 So.2d 496, 499 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), and held that under the instructions given in Martin, ‘the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor.’ For cases following Martin, see Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 *196 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). The instructions given in Martin are substantially the same as those given in the instant case. After reviewing the instructions in the present case in their entirety, we conclude that there is no reasonable likelihood or probability that the jurors believed or could have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating circumstance. The instructions were not only legally correct, but were clear and understandable. The case relied upon by the appellant, Mills v. Maryland, is factually distinguishable from the instant case. We find no merit in the appellant’s contention, and no plain error in the instructions.”
710 So.2d at 1307; see also Weaver v. State, 678 So.2d 260, 282 (Ala.Cr.App.1995), rev’d on other grounds, 678 So.2d 284 (Ala.1996).
Here, as in Williams, the jury was properly instructed that once Freeman offered a mitigating circumstance, the State had the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. No portion of the trial court’s instructions suggested to the jury that its findings concerning mitigating circumstances had to be unanimous. Moreover, the trial court’s instructions were in accordance with the Alabama Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried Under Act No. 81-178. After reviewing the trial court’s instructions, we find that there was “no reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstance.” Williams, 710 So.2d at 1307.
Accordingly, we find no error, much less plain error, as to this claim.
XII.
Freeman asserts that Alabama’s application of the statutory aggravating circumstance that the offense was especially heinous, atrocious, or cruel as compared to other capital offenses is “unconstitutionally vague and has been applied in an overly broad and arbitrary manner.” (Freeman’s brief, p. 58.) This claim is presented for the first time on appeal; therefore, our review will be for plain error. Rule 45A, Ala.R.App.P.
To the extent that Freeman is claiming that the “especially heinous, atrocious or cruel” statutory aggravating circumstance found in § 13A-5-49(8), Ala.Code 1975, is unconstitutional on its face, that argument is without merit. See Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (1989), cert. granted, judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); Hallford v. State, 548 So.2d 526, 541-42 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
To the extent that Freeman is claiming that the “especially heinous, atrocious or cruel” statutory aggravating circumstance was unconstitutionally applied in his case, a claim also reviewable only for plain error, we find that argument to be without merit as well. Freeman appears to argue in his brief to this court that the trial court, by instructing the jury that all capital offenses were to some extent heinous, atrocious, or cruel, “stripped away” any “standard of comparison” for the jury to use in determining the existence or nonexistence of the statutory aggravating circumstance in his case. (Freeman’s brief, p. 59.)
The trial court instructed the jury on the “especially heinous, atrocious or cruel” statutory aggravating circumstance as follows:
“Number two circumstance for you to consider, the capital offense was espe- *197 dally heinous, atrocious, or cruel compared to other capital offenses.
“The term ‘heinous’ means extremely wicked or shockingly evil. The term ‘atrocious’ means outrageously wicked and violent. The term ‘cruel’ means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.
“What is intended to be included in this aggravating circumstance is those cases where the actual commission of the capital offense is accompanied by such additional acts as to set this crime apart from the norm of capital offenses. For a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in any capital offense. For a capital offense to be especially cruel, it must be a conscienceless or pitiless crime which is unnecessarily torturous to the victim.
“All capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness, and cruelty exceeds that which will always exist when a capital offense is committed.”
(R. 1309-10.)
In Ex parte Kyzer, 899 So.2d 330 (Ala.1981), the Alabama Supreme Court held that for a crime to fit within the “especially heinous, atrocious or cruel” aggravating circumstance listed in § 13-11-6(8) [now § 13A-5-49(8) ] it must be one of “those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.” 399 So.2d at 334. Clearly, the trial court’s instructions in this case reflected the limiting construction of the statutory aggravating circumstance established in Ex parte Kyzer. See Hutcherson v. State, 677 So.2d 1174, 1203 (Ala.Cr.App.1994), rev’d on other grounds, 677 So.2d 1205 (Ala.1996); Slaton v. State, 680 So.2d 879, 903 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); Bui, 551 So.2d at 1119.
Furthermore, the trial court’s instructions were identical to the Alabama Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried Under Act No. 81-178. “A trial court’s following of an accepted pattern jury instruction weighs heavily against any finding of plain error.” Price v. State, 725 So.2d 1003, 1058 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998). For cases in which the same, or essentially the same, instructions were given to the jury, and were approved by the appellate courts of this state, see Price, supra at 1057; Knotts v. State, 686 So.2d 431, 446-47 (Ala.Cr.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997); Slaton, supra at 902; Haney v. State, 603 So.2d 368, 385-86 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Ex parte Bankhead, 585 So.2d 112, 123-24 (Ala.1991), aff'd on return to remand, 625 So.2d 1146 (Ala.1993), rev’d on other grounds, 625 So.2d 1146 (Ala.1993); Bui, supra at 1120; Hallford, supra at 541-42
Freeman’s conduct, which we have discussed previously in this opinion, clearly was “conscienceless, pitiless, and unnecessarily torturous” to the victims. Both victims were stabbed repeatedly. Testimony at trial indicated that no single one of Sylvia Gordon’s 22 stab wounds was fatal, and that she was conscious for at least 8 minutes after the first stab wound before she eventually bled to death. There was a trail of Sylvia’s blood throughout the house. Testimony also indicated that Mary Gordon could have been conscious for at least 5 minutes after the first of her 14 stab wounds, and that she was raped by Freeman while she was dying. Clearly, these crimes were perpetrated with a design to inflict a great degree of pain and with utter indifference to the suffering of the victims. The degree of cruelty and violence in these crimes far exceeds that *198 which is common to all capital offenses. For the reasons stated above, we find no error, plain or otherwise, as to this claim.
XIII.
Freeman also contends that the trial court erred in failing to find as a statutory mitigating circumstance that Freeman’s “capacity ... to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.” See § 13A-5-51(6), Ala.Code 1975.
“A sentencer in a capital case may not refuse to consider or be ‘precluded from considering’ mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant’s character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).”
Williams v. State, 710 So.2d at 1276, 1347 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
The trial court’s sentencing order reflects that the court found the existence of two aggravating circumstances: that the capital offenses were committed while Freeman was engaged in the commission of, or an attempt to commit, a rape, a robbery, and a burglary, see § 13A-5-49(4), Ala.Code 1975, and that the capital offenses were especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court further found the existence of three statutory mitigating circumstances: that Freeman had no significant history of prior criminal activity, see § 13A-5-51(l), Ala.Code 1975; that Freeman committed the capital offenses while he was under the influence of extreme mental or emotional disturbance, see § 13A-5-51(2), Ala.Code 1975; and that Freeman was 18 years old at the time of the murders, see § 13A-5-51(7), Ala.Code 1975. The trial court’s sentencing order also reflects that the trial court considered all aspects of Freeman’s character or record and any of the circumstances of the offenses that he offered as a basis for a life-imprisonment-without-parole sentence, and any other relevant mitigating circumstances offered by Freeman, and found the following to constitute nonstatutory mitigation: Freeman’s emotional disturbance resulting from a difficult family history and to transfers to a number of different foster and group home placements throughout his life; and Freeman’s “antisocial personality disorder.”
In support of his claim that the trial court erred in failing to find the existence of the § 13A-5-51(6) statutory mitigating circumstance in his case, Freeman relies on the testimony of defense expert Dr. Barry Burkhart. Dr. Burkhart evaluated Freeman in June and August 1989, approximately a year and a half after the murders. Dr. Burkhart testified at the guilt phase of the trial that it was his opinion that Freeman suffered from a ma *199 jor depressive disorder and a schizotypal personality disorder, the latter of which Dr. Burkhart said was similar to a borderline personality disorder and was characterized, in part, by an inability to get along with other people. It was Dr. Burkhart’s opinion that at the time of the murders Freeman experienced a brief reactive psychosis, during which he lost touch with reality. Dr. Burkhart testified that it was very likely that as a result of a brief reactive psychosis and the stress of being abandoned and rejected by Sylvia, Freeman was unable to conform his conduct to the requirements of the law. On cross-examination, Dr. Burkhart testified that he was not a certified forensics examiner and that he did not hold himself out to be an expert in the field of forensic psychology. Dr. Burkhart also testified that it was possible that Freeman was not experiencing a psychotic episode when he murdered the Gordons.
The record reveals that there was, however, an abundance of evidence presented by the state to contradict Dr. Burkhart’s testimony and to show that at the time of the murders, Freeman’s ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was not impaired. Dr. Guy Ren-fro, the court-appointed psychologist who was ordered to perform, and who did perform, a forensic evaluation of Freeman in July and September 1995, made the following conclusions concerning Freeman’s mental state at the time of the murders:
“The information utilized in the current determination of Mr. Freeman’s mental state at the time of the alleged offense includes material contained in the police reports of the investigation of the crime, statements made by Mr. Freeman at the time of his arrest and shortly thereafter, and information conveyed to the examiner during the current evaluation.
“The information examined would indicate that Mr. Freeman was displaying the personality characteristics of a borderline personality disorder at the time of the alleged offense. That is, he had difficulty in maintaining relationships. He was very sensitive to possible feelings of rejection or abandonment. He was likely to manifest intense anger and could engage in aggressive acting out towards others. While these characteristics do appear to have played a role in Mr. Freeman’s choices and decisions during this time frame, there are no indications that he did suffer from a mental disorder or illness which would have prevented him from appreciating the consequences of his behavior. Instead, there are indications both in police reports and in Mr. Freeman’s own statements which indicate that he did realize that certain aspects of his behavior were wrong and thus necessitated further action to conceal his identity and to attempt to avoid apprehension and detection. Mr. Freeman stated in his own words that he knew what he was doing was wrong and was attempting to avoid apprehension. Mr. Freeman does claim amnesia for certain aspects of his behavior on the date of the alleged offense. However, this examiner observed inconsistencies in Mr. Freeman’s description of amnesia. That is, at times Mr. Freeman would state that he did not recall something and later he would make statements indicating that he did have a memory of this incident. Mr. Freeman even admitted that he tends to recall certain details at certain times while seeming to be unable to recall them at others. There were also instances where Mr. Freeman claimed he could not recall any information about a particular time frame but he would later provide detailed and specific information which could be corroborated indicating no problem with his actual memory. These inconsistencies are much more suggestive of a voluntary attempt to avoid disclosure and possible further incrimination rather than a true amnecis event which is the result of a neuropsychological condition.
*200 “In summary, the information reviewed in this evaluation does indicate that at the time of the offense David Freeman was capable of discerning right from wrong and could appreciate the wrongfulness of acts such as that with which he is charged. For this reason it is recommended that the case proceed to trial as scheduled.”
(C. 3471-72.)
Dr. Renfro testified that he found nothing during his evaluation to indicate that Freeman would have had trouble at the time of the murders conforming his conduct to the requirements of the law. He further testified that he found no evidence of delusional thinking or hallucinations. Dr. Renfro stated that all of Freeman’s actions and behavior during and after the murders indicated that he did not lack the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Dr. Renfro also stated that he found nothing to indicate that Freeman was experiencing a brief reactive psychosis when he murdered the Gordons.
The findings of the Lunacy Commission, a team of three psychiatrists at Taylor Hardin Secure Medical Facility who evaluated Freeman in December 1988, were similar to the findings of Dr. Renfro. The Lunacy Commission examined Freeman to determine his competency to stand trial and his mental state at the time of the offense. All three doctors on the commission found that there was no evidence that Freeman was suffering from any mental illness at the time of the murders, nor was there any evidence indicating that, at the time of the murders, Freeman was unable to conform his conduct to the requirements of the law. All of the doctors diagnosed Freeman as having either an “antisocial personality disorder” or an adjustment disorder “with depressed mood.”
As noted above, the trial court did find, as a statutory mitigating circumstance, that Freeman committed the murders while he was under extreme mental and emotional disturbance. The trial court also found as nonstatutory mitigation that Freeman suffered from an antisocial personality disorder. The record reflects that the trial court considered all of the evidence offered by Freeman to establish the existence of the statutory mitigating circumstance that Freeman’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, and based on that evidence, determined that that circumstance did not exist. “The factual determination of the existence or nonexistence of a mitigating circumstance is within the sound discretion of the trial judge where the evidence in that regard is in conflict.” Wesley v. State, 575 So.2d 108, 121 (Ala.Cr.App.1989), rev’d on other grounds, 575 So.2d 127 (1990).
Accordingly, we find that the trial court’s findings concerning the statutory mitigating circumstances were amply supported by the record. Thus, we find no error, much less plain error, as to this claim.
XIV.
In accordance with Rule 45A, AIa.R.App.P., we have examined the record for any plain error with respect to Freeman’s capital murder convictions and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed Freeman’s sentence in accordance with § 13A-5-51, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Freeman’s capital murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court’s findings concerning the aggrava *201 ting and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Freeman of the capital offenses charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning aggravating and mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in finding any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended by a vote of 11-1 that Freeman be sentenced to death by electrocution.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Freeman to life imprisonment without parole or to death, as recommended by the jury. The trial court ordered and received a written pre-sentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Freeman’s participation in the offense.
In its findings of fact, the trial court found the existence of two statutory aggravating circumstances: (1) that the murders were committed while Freeman was engaged in the commission of, or an attempt to commit, or flight after committing a burglary, a robbery, and a rape, see § 13A-5-49(4), Ala.Code 1975; and (2) that the capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court found the existence of three statutory mitigating circumstances: (1) that Freeman had no significant history of prior criminal activity, see § 13A-5-5K1), Ala.Code 1975; (2) that the capital offenses were committed while Freeman was under the influence of extreme mental or emotional disturbance; and (3) that Freeman was 18 years old at the time of the offenses, see § 13A-5-51(7), Ala.Code 1975. The trial court also heard testimony regarding Freeman’s character or record and any of the circumstances of the offenses that Freeman offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala.Code 1975. In this regard, the trial court found that the following evidence was mitigating: (1) that Freeman was emotionally disturbed as a result of his difficult family history and his numerous placements to and transfers from various foster and group homes throughout his life; and (2) that Freeman was diagnosed as suffering from an “antisocial personality disorder.”
The trial court’s sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstances against the statutory and nonstatu-tory mitigating circumstances in the case, the trial court found that the aggravating circumstances outweighed the statutory and nonstatutory mitigating circumstances. Accordingly, the trial court sen- *202 fenced Freeman to death. The trial court’s findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.
Freeman was convicted of the offenses of murder committed during a robbery, murder committed during a burglary, murder committed during a rape, and the murder of two or more persons by one act or pursuant to one scheme or course of conduct. These offenses are defined by statute as capital offenses. See § 13A-5-40(2), (4) and (10), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., cases dealing with murders committed during a robbery: Burgess v. State, [Ms. CR-94-0475, December 18, 1998] — So.2d - (Ala.Cr.App.1998); Clemons v. State, 720 So.2d 961 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Brownlee v. State, 545 So.2d 151 (Ala.Cr.App.1988), aff'd, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Davis v. State, 536 So.2d 110 (Ala.Cr.App.1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); see also the following cases dealing with murders committed during the course of a burglary: Neal v. State, 731 So.2d 609 (Ala.Cr.App.1997), aff'd, 731 So.2d 621 (Ala.1999); Knotts v. State, 686 So.2d 484 (Ala.Cr.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997); Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Thomas v. State, 539 So.2d 375 (Ala.Cr.App.), aff'd, 539 So.2d 399 (Ala.1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989); see also the following cases dealing with murders committed during a rape: Brooks v. State, 695 So.2d 176 (Ala.Cr.App.1996), aff'd, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997); Bradley v. State, 494 So.2d 750 (Ala.Cr.App.1985), aff'd, 494 So.2d 772 (Ala.1986), cert. denied, Williams v. Ohio, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987); Dunkins v. State, 437 So.2d 1349 (Ala.Cr.App.), aff'd, 437 So.2d 1356 (Ala.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984); see also cases dealing with the murder of two or more persons: Pilley v. State, [Ms. CR-96-1781, August 14, 1998] - So.2d - (Ala.Cr.App.1998); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd,; Williams v. State, supra; Taylor, supra; Siebert v. State, 555 So.2d 772 (Ala.Cr.App.), aff'd, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); Hill v. State, 455 So.2d 930 (Ala.Cr.App.), aff'd, 455 So.2d 938 (Ala.), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984).
After carefully reviewing the record of the guilt phase and the sentencing phase of Freeman’s trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court’s judgment that the aggravating circumstances outweigh the mitigating circum *203 stances, and that death is the appropriate sentence in this case. Considering Freeman and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
For the reasons stated above, Freeman’s convictions and sentence of death are affirmed.
AFFIRMED.
McMILLAN, BASCHAB, and FRY, JJ, concur.
COBB, J., recuses herself.